# LAW OFFICE OF JOHN F. CARMAN

Attorneys at Law

| OF COUNSEL | 666 Old Country Road | ASSOCIATE ATTORNEY |
|---|---|---|
| SUSAN SCARING CARMAN, ESQ. | Suite 501 | SARA M. PERVEZ |

Garden City, New York 11530
(516) 683-3600

PARALEGAL

Facsimile
(516) 683-8410

ANNA M. SACCO

February 18, 2022

**VIA ECF**
Honorable Joan Azrack
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

     Re: *United States v. Linda Mangano*
       *Indictment No. 16-cr-540*

Dear Judge Azrack:

  Please accept this letter, which is submitted on behalf of my client, Linda Mangano, in advance of sentencing on March 24, 2022. For all of the following reasons, it is respectfully submitted that the Court impose a sentence of community service that is justified by a life defined by kindness and a selfless impulse to help others less fortunate.

A. INTRODUCTION

  I begin with the thought that the Court has been immersed in this case for more than six years. After two trials lasting twenty weeks and endless motion practice, Your Honor has likely formed opinions about Linda Mangano based upon the case that was presented against her. It would be understandable if the caricature of her that was created for and by the trial, was in part at least, informed by those opinions.

  Cast as an entitled and lazy "food tester", the truth of Linda Mangano and the life she has lived in service to others was largely left out of the story. With this submission, it is our intention and hope that the Court will have a legitimate opportunity to come to know Linda for the person she truly is.

  It is just as important to understand how she came to be involved in all of this. To begin, it seems uncontroversial and fair to note that she was swept up in something far bigger than she was and way beyond the scope of her life experience. Plainly put, Linda never really saw any of

1

this coming. And how could she have? Throughout her life, she trusted without question and opened her heart without hesitation. Those very qualities that make Linda so special, are the same qualities that contributed to Linda becoming involved in this nightmare.

Almost twenty years ago, Linda welcomed Harendra Singh into her life. Like many, she referred to him as "H". At the time, he was not a restaurant mogul. He was just finishing a stint as a manager at Burger King. From emails introduced at trial, it was clear that she cared for him and believed that they shared a deep and honest friendship. It was a relationship that was, she thought, built on mutual respect and trust.

Rather than wealth or power, it was Mr. Singh's apparent humble nature and determination that Linda admired. Overtime, Mr. Singh's family became a part of Linda's family. They shared holidays together, celebrated milestones and birthdays and shared many family outings. He was a frequent guest at Linda's dinner table and entered the house without knocking, as any family member would. When Linda's mother became gravely ill, it was Mr. Singh's father who saved her life and it was Mr. Singh who helped Linda find the care she needed.

Mr. Singh, however, we learned together, harbored a dark side that he concealed from everyone around him. When it began, who knows, but he turned out to be - or into - a serial criminal. He was the type of person who would break any law that stood in the way of what he wanted. He weaponized his charm, wealth, and influence to insinuate himself into the lives of people way more sophisticated than Linda. One need only remember the one hundred or more photographs introduced at the first trial – a who's who of the powerful, wealthy, and respected people who fell under Mr. Singh's spell. Public officials, judges, lawyers, doctors, all made the list. Perhaps, the most heartbreaking of all was Mr. Singh's parents – committing crimes against his own parents - unimaginable to most of us, was business as usual for this man.

Yes, Linda Mangano allowed this man into her house and, into her life. She has often said that she was taught to trust people until she was given a reason to doubt them. If there is any criticism regarding the manner in which Linda lived her life, it would be her adherence to that maxim and her failure to perceive Mr. Singh's true character. Of course, she was far from alone.

B. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

*FALSE STATEMENTS*

Your Honor would probably agree that the tried-and-true approach for seeking leniency in sentencing is to apologize and to accept responsibility for committing the crimes at issue. There are occasions however, where, as here, a person convicted of a crime harbors a firm and honest belief that they are not guilty – even though a jury found them to be so. Most would agree that expressing remorse in such a case is dishonest. Indeed, if Linda was willing and able to admit guilt for Your Honor, it would beg the question, why did she not just do that six years ago and spare herself the hell she has gone through? The simple reason is that she holds a firm and

honest belief that she did not intentionally make false statements to the FBI and that she did not obstruct the government's investigation.

The "nature and circumstances" of the offense conduct in this case militate strongly in favor of lenient treatment at the upcoming sentencing. Though we spent almost half a year in court, most of the behind-the-scenes details of "how this happened" were not fleshed out in the courtroom. What follows are some of those critical details.

As Your Honor will recall, the jury found Linda *not guilty* of the false statement charge pertaining to January 13, 2015 – that was the date of the unannounced visit by the FBI to her house. Without counsel, she engaged with the agents and answered questions about, among other things, "what she did for Mr. Singh." The evidence, the jury concluded, was insufficient to find her guilty of falsely making any one of five separate statements that were referenced in the indictment.

After the visit from the FBI, Linda reached out to me to assist her with responding to a grand jury subpoena that was left. We had never met before. We discussed what documents were required by the subpoena and we provided them to the government. It should be obvious, but I will assure Your Honor anyway, that Linda did not suggest, nor would I have participated in any effort to make up time sheets or otherwise fabricate documents that would have made Linda's efforts on Mr. Singh's behalf, appear to be more than they were. Nor has the government ever made such a claim.

After the document production, I engaged in conversations with the government regarding its request to interview Linda in a "proffer." Before agreeing, I engaged in extensive conversations with Linda about her employment relationship with Mr. Singh's company and the details of what she did and did not do. Linda believed that it was important that she make every effort to cooperate with the investigation.

On my end, as I always do, I explained to Linda that there was no point in a proffer if she was not prepared to tell the truth. In May of 2015, we agreed to meet to answer "follow-up" questions regarding "what she did for Mr. Singh." We most definitely never had any discussion that could be interpreted to be part of an effort to frustrate the investigation.

Nevertheless, statements made at the proffer of May 20, 2015, served as predicates for the second false statement charge in the indictment. The jury found Linda *guilty* of that count. Although it is not known if the jury agreed on any specific statement, the three statements that they were given to consider were as follows:

1) She went to Water's Edge three or four times in relation to work when she first started working for Singh.

2) She designed a two-sided menu for Besi and made all the revisions to the menu.

3) At her then current job at Porteck/Orion, she spent approximately two days per week in the office.

3

As proffers go, the May 20, 2015, meeting was far from routine. The atmosphere was tense and there were six members of the prosecution team present in the conference room asking questions. The "what did you do for Mr. Singh" question was asked again and again, often tying into documents that Linda had previously provided reflecting tasks that she had performed in relation to Singh's restaurants. At that meeting, Linda acknowledged that she did not have "set hours" and explained that she found it difficult to distinguish between what she did in the "capacity of an employee and what she did as a friend."

Observing a lack of clarity in the form and conduct of the interview, I intervened to make the point that should have been obvious after ten minutes of questioning. My statement was captured verbatim in the FBI 302 that memorialized the meeting. According to the 302 at p. 5., I said: "*Linda Mangano was not claiming to have performed a lot of work as a part of her employment for Singh.*"  (Exhibit A).  So, at the first proffer, it was clear that Linda admitted that she received a salary from Mr. Singh and was not required to do "a lot" of work in exchange for it.

For reasons we will probably never know, the questioning did not thereafter refocus on any of Linda's previous answers or otherwise seek clarification after what can only be described as a crystal-clear representation on her behalf. Rather, the subject matter meandered into a variety of Singh-related topics. The meeting ended with our agreement to reconvene to conclude the interview on May 22, 2015. On that date, in a 302 report that is seven single-spaced pages, there is virtually no reference to the nature and extent of the work Linda did, save a comment that she and Singh "expected the job to be "more than it was." (Exhibit B p. 6)

The second proffer gave rise to the second false statement charge.  The following three statements were submitted for the jury's consideration.

1) In April 2014, she told Singh that she was leaving his employment.

2) She could have been employed by NYS Assemblyman Michael Montesano, instead of Singh at a salary of $80,000 per year, but that she declined that job.

3) She denied that her purported job with Singh was a no-show job.

The jury found her guilty of making at least one of the statements, although it is not clear which one.

*OBSTRUCTION OF JUSTICE*

Linda Mangano was convicted of Obstructing Justice on the strength of Mr. Singh's testimony alone. The conviction on this count is "grouped" for guideline calculation purposes and is not described with any detail in the probation report. While the offense does not impact the guidelines, we recognize that Your Honor's perception of this conduct could impact the sentencing equation.

Evidence of the supposed effort to "obstruct" the investigation was sparse, at best.  Linda and Mr. Singh briefly on just two occasions. According to Mr. Singh's barely intelligible account, the meetings were held in order to "get the story straight" about Linda's job.

Whatever the intent, it was a decidedly poor effort. There was no evidence of witness tampering, evidence destruction, creation of false documents or any of the other typical indicators of an effort to impede a federal investigation. Linda's statement at the May 22, 2015 proffer, that her "employment did not turn out to be what either she or Mr. Singh thought it would be" amounted to a further admission of a "low show" job – rather than an effort to say otherwise.

Understanding that the jury concluded that obstruction did occur and that it involved Linda and Mr. Singh, it is still curious that a brief meeting or two, without specific efforts to obstruct would be convincing to a jury. After all, if the true intent was to compare notes and recall events of the past, standing alone, that is hardly nefarious. This is especially so when compared to the process used by the government to wade through and excuse the tsunami of lies Singh admittedly told in his 45+ prep sessions in order to get him "ready for trial."

It is also important to note that the second time Linda met with Mr. Singh, she was told to do so by the prosecution at the end of the first proffer. After questions about Fred Mei, someone Linda did not know, it was suggested that Linda "ask her good friend "H" about who Fred Mei was."

Finally, it should be noted that at the first "obstruction" meeting with Mr. Singh, attorney Joseph Conway was present. As the Court is well-aware, Mr. Conway is a preeminent and ethical attorney who is held in the highest regard by the legal community. As Mr. Singh's attorney, Mr. Conway's brief contact with Linda amounted to an effort to calm Linda's nerves and to assure her that the proffer interview would be professional and respectful on the part of the government. The idea that Mr. Conway participated in, or knew of, a plan to lie to the FBI, is simply not believable.

C.     GUIDELINE CALCULATION

On March 15, 2021, a letter was filed with Probation objecting to a proposed 3-level enhancement due to a specific offense characteristic under U.S.S.G. § 2J1.2(b)(2). The proposed enhancement was recommended on the strength of the idea that Linda "substantially interfered with the administration of justice" in that the "government conducted some forty interviews to refute the statements" she had made.

As discussed in our letter to Probation, Linda was questioned for several hours about the details of events and specific actions, many of which had occurred years prior. There was no reasonable interpretation of her answers that would have led to the conclusion that what she did for Mr. Singh was anything other than minimal.

For example, she recalled that she "went to the Water's Edge three or four times" during her entire four-year employment with Mr. Singh; was "involved in two events as part of her employment", "designed a post card which "may have taken her a day" and "believed that the job would have been more than it was." And then, as explained above, speaking on Linda's behalf, I drove the point home by saying that "Linda was not claiming to have performed a lot of work as part of her employment for Singh."

5

In its February 16, 2022, addendum, probation notes that "the false statements were an attempt to obstruct the investigation of the true nature of the defendant's "job" with Singh, which, in reality was a bribe by Singh to Edward Mangano in exchange for his assistance." The problem with that reasoning is that in May of 2015, Linda Mangano had no idea what the government's theory of prosecution was against her husband, nor has the government ever suggested that she did. She knew nothing of "bread and rolls", a loan guarantee or an emergency response after hurricane Sandy.

What she did know was that a long-time friend, a person she trusted, had offered her a job that turned out to require little of her. She acknowledged that she was paid well, but admitted unequivocally, in her own words and through mine, that she "did not do a lot." Once that was clear, whether she claimed to have suggested the name for a diner or designed a two-sided menu for Besi - it was all completely beside the point.

Thus, the 3-level enhancement for "causing the government to conduct forty" unnecessary interviews, is not appropriate. The defense does not otherwise take issue with the guideline analysis in the PSR.

D.   CHARACTERISTICS OF THE DEFENDANT

While much about Linda is known, I have taken the liberty of enclosing letters from family members, friends, and others with whom she has had contact in her life. In Exhibit C, you will find select letters which speak to Linda's personal characteristics from the perspective of family members and those closest to her. In Exhibit D, I have presented approximately 60 letters that speak in a singular voice as to Linda's honesty, humility, compassion, and history of service to others. While we did not intend to burden the Court with a deluge of testimonials, the letters have been coming in with such frequency, that it seemed important for the Court to know the level of support there is for Linda in the community.

Section 3553 requires that the history and characteristics of the defendant be considered as a part of the process by which sentence is imposed. The trials cast Linda in a light that suggested that she was dishonest entitled and lazy. She accepted an employment position from a friend where she was required to do little work for considerable pay. Unbeknownst to Linda, the "friend" was angling for favors from her husband.

The letters we have received speak of a person who exhibits characteristics that are squarely opposed to what was presented at trial.

**BART CAFARELLA** – one of the owners of Realty Connect USA writes…  I have worked closely with Linda Mangano daily for the past three and a half years and so I have come to know her extremely well and can say that Linda has been the most diligent and hardworking employee we have ever hired. She is dedicated, trustworthy, hardworking and has gone above and beyond, often staying late, coming in early and working weekends.
More importantly, she is the most compassionate and empathetic person/employee I have ever met. She has counselled many of our agents regarding drug addiction and personal

family issues that surround heroin, opioid and alcohol abuse.  She does this on her own personal time.  The Linda I know would not deceive or intentionally mislead anyone for any reason. This is a woman who raised 2 wonderful children with her values, to help others. Alex is an Assistant District Attorney in the Bronx and Sal is a Nassau County Police Officer. On a personal note, I have come to know Linda to be honest and forthcoming always. I trust her with my business. I trust her with my life.

**SELMA BERMAN** – a 92-year-old senior citizen from Atlantic Beach, who has known Linda for approximately the last four years, writes in her letter that Linda visited her regularly in Woodbury and always called to make sure she was ok.  When she moved to Atlantic Beach, Linda still visited, bringing crumb cake, a smile and warmth. She went to say, "I almost forgot all the trauma going on in her personal life because she never brings it up or discusses the fact that she is going to be sentenced. I have never once heard her feel sorry for herself. It's always about how I am doing and if I need anything.  To know her is to love her."

**KEVIN HEALY -** the Assistant Principal at Bethpage High School writes that Linda Mangano "is one of, if not the most kind, generous, humble, helpful, selfless and trustworthy individuals I have encountered in my 39 years of education. Linda has sacrificed hours and hours of her time and her caring attitude and supportive nature has earned her the respect and affection of students and parents alike."  He tells a story about cancelling a trip to South Bend to see a Notre Dame football game so that he could attend Linda's induction into the Bethpage High School Hall of fame. True to form, when she found out, she gave him a plaque with the Notre Dame stadium on it and thanked him for being with her. Typical of Linda, thinking of others.

**TERRENCE CLARK –** the retired Superintendent of the Bethpage School District "marveled at how Linda was able to do so many things – run a newspaper business, travel around the county and volunteer at so many events and serve as mother to two wonderful children. She has incredible energy and a dynamic personality."

**ELIZABETH COTTON**- a legal secretary who has known Linda for 17 years, writes about working alongside Linda as President and Vice-President of the Bethpage Middle School PTA, the Bethpage High School PTA, and the Bethpage Council of PTAs. "In order to serve as an officer on any of the PTA's, you must first be nominated for the position by the nominating committee, and then pass a majority vote from the entire PTA body. Linda's name was consistently mentioned for leadership positions. She had proved, over and over, that she was responsible, trustworthy and that her work ethic was such that she could be trusted to handle leadership positions."

Ms. Cotton also chronicles Linda's work with opioid addiction and then goes on to note that "this case has changed Linda.  She as become guarded, wary, and withdrawn. True to the way she has always been, her concern is how the outcome of this sentence will impact her family."

7

**SANDRA OLIVA** – the former Executive Director of the Nassau County Coalition Against Domestic Violence who has known Linda since 2010. She writes that Linda "is an extraordinarily loving person. She can and does make anyone who meets her smile and is generous with her time and her enormous energy. I know that she has spent many hours meeting with recovering addicts, running groups to help them through recovery and prevent addiction. Linda exudes warmth and caring. If you invite Linda to a meeting, she shows up with homemade desserts. If you tell her a problem you have, she tries to find a way to help you."

**KATHY COMERFORD** – very few people know Linda as well as Kathy Comerford. She observes that, "Linda Mangano doesn't see black or white, political party, young or old or economic status, she sees people for who they are in the core of their being, she sees them in the eyes of the purest optimist who feels a simple act of kindness can make a small difference in someone's life." Mrs. Comerford also recalls the aftermath of Sandy when Linda brought homemade chili and cornbread to the emergency workers, late at night, long after the media had left.

**JILL NEVIN** - A CSEA employee of Nassau County responsible for outreach to the senior citizen population, recalls Linda contacting her to inquire as to whether she could be a part of it. Linda, she says, "gave generously of her time, compassion and warmth. Every single room we visited, no matter what the situation presented, Linda greeted all patients with a hug, kiss, love, and conversation. This is the real Linda Mangano."

**FERN KARHU** – Linda's employer since August of 2018 at Realty Connect USA. The take-away from this letter is that Linda is an extremely hard worker who takes on all tasks and contributes far beyond her job description. Moreover, she has used her position with this company to organize and support a multitude of charitable causes. It is clear that for Linda, giving back to the community is not a matter of obligation, but a moral imperative that she abides by day in and day out.

**WALTER RODIER** – a retired 39-year member of the United States Customs Service, Mr. Rodier volunteers at the Nassau County Jail in East Meadow. He met Linda Mangano at a Vivitrol Education and Support program. He reports that he "has attended these meetings weekly and have observed the caring leadership exercised by Mrs. Mangano. I personally know several individuals, who had been enslaved by addiction, who credit Linda with saving their lives."

**DEBRA NIMMO –** a lifelong friend describes Linda this way: "I would say that she is one of the most caring, selfless, talented and kindest people I know. She was put on this earth to help people and that is what she has done without the expectation of praise or acknowledgement."

**BARABAR POGGIO** – Linda's friend of 25 years writes as follows: "Whether a friend or stranger, Linda has always been there to help. I have never known Linda to do anything unethical in all the years I have been with her. I have also never known her to

be a liar. The "Linda" I know lights up a room when she walks in and makes everyone feel good."

**JENNIFER MOORE –** Dr. Moore is on the Board of St. Joseph's Hospital. She recalls her history of interacting with Linda in a variety of community and charitable endeavors. While evidence of Linda's selfless contributions to the Long Island community are well-documented, Dr. Moore provides a virtual laundry list of the many events and causes that she supported.

**JOHN GACINSKI –** offers his recollections regarding Linda's efforts to help with the opiate crisis. He notes that "the norm is that those who volunteer are either in recovery or someone dear to them is. That is not the case with Linda. She is a tireless advocate for those in recovery and their families. I can guarantee you that there are people today whose lives have been saved – and given the ripple effect of addiction, their families too have been saved – by Linda's efforts.

Simply put, Linda Mangano's personal character and history contrast sharply with the crass depiction crafted for the purposes of the trial. Whatever that image, the truth about Linda Mangano is that she has lived a life of service to others that is extraordinarily impressive.

CONCLUSION

I would like to conclude by thanking Your Honor for the courtesy you have exhibited to me in my efforts to advocate on behalf of Linda Mangano. I know that it is not lost on the Court that a case like this imposes demands on everyone involved, that far exceed the norm.

On a personal level, over the last seven years, I have come to my own conclusions about this special person. There is nothing like twenty weeks in the crucible to reveal the truth about who someone really is. Day after day, Linda walked in and out of this courthouse, kept her chin up, her spirits high and treated everyone around her, including the cameramen, with kindness. To me, it was awe-inspiring.

Was it an act? Partially. Inside, Linda was truly crushed. While she only showed emotion once or twice in the courtroom, the last seven years have caused pain, sadness and suffering that have pushed her beyond her limits. Whatever the financial benefit from her relationship with Mr. Singh, the costs have exceeded it by a factor of a thousand. Her life and marriage are in shambles, and she faces the later stages of her life in financial ruin. She does have a job, which is a miracle given the attention this case received, however, she will suffer the ramifications of this seven-year ordeal for the rest of her life.

In retrospect, Linda can certainly see how her relationship with Mr. Singh appears to others, given that she was married to a public official. In real time, unfortunately, she failed to recognize that by accepting her "friend's" generosity, she was putting herself in grave danger. There were very few people who knew the truth about Mr. Singh. Linda was not among them.

9

      For all of these reasons, I respectfully request that the Court impose a sentence that does not add to the punishment already suffered. Linda Mangano has a rare gift in her ability to lift up those around her. While I am certain that she will continue in this vein regardless, a sentence by the Court that includes a requirement of community service would serve the interests of the public and justice.

      Thank you again for your consideration.

Very truly yours,


_____/s/_____

JOHN F. CARMAN
(JC 7149)

Encls.
JFC/as